[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Plaintiff brings this two-count complaint against the Commissioner of Education for the State of Connecticut (Commissioner), the Woodstock Association of Teachers (Association), and the Connecticut Education Association, Incorporated (CEA) seeking the following relief: CT Page 37
1. A writ of mandamus compelling the Commissioner to institute and administer arbitration proceedings between the Town Board of Education and the Woodstock Association of Teachers pursurant [pursuant] to Connecticut General Statutes section 10-153f(c);
2. A mandatory injunction compelling the Commissioner to institute and administer arbitration proceedings between the Town Board of Education and the Woodstock Association of Teachers pursuant to Connecticut General Statutes section 10-153f(c);
3. A declaratory judgment that the Referendum was valid and that the Contract was properly rejected in accordance with Connecticut General Statutes section 10-153d(b); and
4. Such other relief as this Court deems just and proper.
Facts
The parties have stipulated to the following:
1. The Town is a municipality with its boundaries located within the County of Windham and State of Connecticut.
2. The Commissioner is the Commissioner of Education for the State of Connecticut.
3. The Woodstock Association of Teachers (WAT) is the duly authorized bargaining agent for teachers employed by the Woodstock Board of Education.
4. The CEA is the state teachers association with which the WAT is affiliated.
5. On or about November 10, 1993, the Board of Education of the Town of Woodstock (the Town Board of Education) filed with the Town Clerk of the Town of Woodstock (the Town Clerk) a copy of the contract between the Town Board of Education and the WAT for the years 1994-1997 (the Contract). CT Page 38
6. On or about November 24, 1993, electors of the Town of Woodstock presented a petition to the Town Clerk requesting a special town meeting under Connecticut General Statutes section 7-1 "[t]o discuss the new Teachers Contract for 1994 through 1997 and to determine whether the Town should accept or reject it."
7. On or about November 26, 1993, the Board of Selectmen of the Town of Woodstock (the Board of Selectmen) scheduled a special town meeting on December 2, 1993, to consider the Contract.
8. The special town meeting described in paragraph 5 was duly called and validly convened within thirty days after the filing of the Contract to consider whether to approve the Contract.
9. Acting pursuant to the authority vested in them by Connecticut General Statutes section 7-7, the Board of Selectmen adjourned the special town meeting to a referendum to be held on December 9, 1993 (the Referendum).
10. The question presented to the electors of the Town at the Referendum was phrased as follows:
 SHALL THE TOWN OF WOODSTOCK APPROVE THE CONTRACT BETWEEN THE WOODSTOCK BOARD OF EDUCATION AND THE WOODSTOCK TEACHERS' ASSOCIATION FOR THE YEARS 1994 THROUGH 1997, AS FILED WITH THE WOODSTOCK TOWN CLERK ON NOVEMBER 10, 1993?
11. The question was defeated in the Referendum by 411 "no" votes to 392 "yes" votes.
12. By letter dated December 15, 1993, the Superintendent of Schools of the Town (the Superintendent) notified Leslie A. Williamson, the Commissioner's designee for the purpose of administering arbitration proceedings under Connecticut General Statutes section 10-153f(c) (the Designee), that the Town's legislative body had "voted in Referendum not to approve the" Contract. A copy of the question presented to the electors as set forth in 9 above was attached to this letter.
13. On or about December 16, 1993, counsel to the CEA CT Page 39 wrote a letter to the Designee in which counsel to the CEA challenged the validity of the Referendum on the ground that the Town's legislative body did not "reject" the Contract in accordance with Connecticut General Statutes section 10-153d(b).
14. By letter dated December 20, 1993, the Designee, on behalf of the Commissioner, informed the CEA's counsel, the Superintendent, counsel for the Town's Board of Education, and the Chairman of the Town's Board of Finance that "arbitration will not be instituted" under Connecticut General Statutes section 10-153f(c) because the Contract was not rejected in accordance with the requirements of Connecticut General Statutes section 10-153d(b).
15. The Commissioner has confirmed the authority of the Designee to act on his behalf and has refused to reverse the Designee's action.
Law
At the hearing on December 2, 1994 the parties seemed to agree that the only issue is whether the negative answer to the language of the question set forth in paragraph 10 of the parties' stipulation of facts constitutes proof that the town "body rejects such contract."
It is clear that the voters did not approve the contract. By their vote they did not "sanction officially . . . rectify; [or] confirm" (Webster's New International Dictionary, Second Edition) the contract. By voting in the negative they disapproved the contract. According to Webster's, id., to disapprove is
 "2[1] To pass unfavorable judgment upon; to condemn; to I regard as wrong; . . .
 3. To refuse approbation to; to decline to sanctions; reject . . . "
Whether we look at Webster's or Roget's International Thesaurus, Fourth Edition, or just an ordinary human reading of the statute; the question and the answer, the "body rejects [the] contract." CT Page 40
The defendants cite the court to an opinion of a referee in Pomfret Teachers' Club v. Town of Pomfret, No. 16049 (Super. CT, Windham Cty, 7/13/72). The referee, King, in his memorandum on page 4 states, "Apparently the General Assembly felt that it was important that such a contract, if disapproved at all, be disapproved promptly and definitely." He at least recognized that disapproval is the equivalent of rejection.
But Referee King and defendants in their brief stress the "presumptive approval" that occurs if an agreement is not rejected. This just reenforces the concept that with a legislative approval you do not need a presumptive approval and with a lack of legislative approval, or rejection, you have no contract. The presumptive approval only comes into play if the legislative body did neither.
After the referee's opinion the superior court, Naruk, J., rendered an opinion in East Haddam Educ. Ass'n. v. Townof East Haddam, No. 21484 (Super. Ct, Middlesex Cty, 4/13/73) stating that referenda questions designated "Against the Teachers Contract — No" or "For the Teachers Contract — Yes" were appropriate under C.G.S. § 10-153d and that the resulting No vote was a rejection of the teachers' contract.
After Judge Naruk's decision was rendered on April 13, 1973 the legislature enacted P.A. 73-391 amending C.G.S. § 10-153d but only in regard to the town clerk's obligation to give public notice of the filing of the contract. That act was passed May 25, 1973 and took effect October 1, 1973.
Thereafter the statute was amended at least eleven times without any change intended to overrule, correct or modify what Judge Naruk had said.
As state senator Gloria Schaffer said during the 1969 debate, "However, the legislative body . . . has thirty days in which they [sic] can reject the contract if they feel the contract is unreasonable in any way, they can then return the contract with a negative vote. . .". Conn. Gen. Assembly Senate Proceedings of 1969, Vol. 13, part 6, at 2927. CT Page 41
Obviously, it is hard to pose a referendum question as to whether or not to reject — say no to — something that is devoid of serious danger of confusion and misinterpretation. To vote yes to reject a contract is the same as asking the voter to vote yes if you want to say no to the contract. Senator Schaffer's remarks reflect a recognition of that dilemma.
The law is clear that if the contract is presumptively approved the city or town must fund it. C.G.S. § 10-153d(b). With this principle clearly in focus we must give the utmost respect to the expressed wishes of the town residents who might very well be liable to pay increased taxes to fund the contract.
As Senator Schaffer said, if the "legislative body" feels the contract is unreasonable it "can then return the contract with a negative vote." This it did. It voted no to approval, not yes to rejection.
Both defendants and Referee King speak of "presumptive approval." The opposite of approval is disapproval. That's what the voters did — they disapproved the contract.
To construe this vote otherwise than as a rejection would "defeat the manifest intent and purpose of the town in passing" on the question. Woodward v. Reynolds,58 Conn. 488, 491.
The court finds irreparable harm.
The court can think of no adequate remedy at law for the plaintiff nor has it been directed to any.
The Commissioner is required to institute and administer the arbitrators proceedings under C.G.S. 10-153f(c). This duty is mandatory.
The plaintiff under the statute has a clear legal right to demand the Commissioner fulfill his mandated duties.
Judgment for plaintiff in accordance with this opinion.